IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No: _____

| | | |
|---|---|---|
| DOUGLAS R. SMITH; MARY LUCZAK-SMITH; DRS FAMILY MANAGEMENT, LLC; FORTIS CAPITAL HOLDINGS, LLC; SMITH CLOVIS CAPITAL HOLDINGS, LLC; CLOVIS CAPITAL VENTURES, LLC; and SMITH AND SONS ENTERPRISES, LLC, | | |
| Plaintiffs, | | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |
| v. | | |
| AVERY CHAPMAN; TARYN HARTNETT; and CHAPMAN LEGAL GROUP, PLC, d/b/a Chapman Law Group, PLC, | | |
| Defendants. | | |

Plaintiffs, Douglas R. Smith ("Mr. Smith"); Mary Luczak- Smith ("Mrs. Smith"); DRS Family Management, LLC ("DRS Family Management"); Fortis Capital Holdings, LLC ("Fortis"); Smith Clovis Capital Holdings, LLC ("Smith Clovis"); Clovis Capital Ventures, LLC ("Clovis"), and Smith and Sons Enterprises, LLC ("Smith and Sons") (collectively, "Plaintiffs"), allege as follows for their Complaint against Defendants, Avery Chapman ("Mr. Chapman"); Taryn Hartnett ("Ms. Hartnett"); and Chapman Legal Group, PLC, d/b/a Chapman Law Group, PLC ("Chapman Law") (collectively, "Defendants").

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

## INTRODUCTION AND SUMMARY OF THE ACTION

The public's ability to trust their lawyers is the cornerstone of the legal profession. This matter cuts directly at the core of this public trust upon which the profession is predicated. Defendant Avery Chapman is a Florida lawyer who works through his law firm, Defendant Chapman Law. Defendant Taryn Hartnett is his wife. Mr. Chapman and Ms. Hartnett collaborated to earn the Plaintiffs' trust, by capitalizing on a relationship between Ms. Hartnett and Mrs. Smith to encourage Mr. Smith to retain Mr. Chapman. Mr. Smith initially retained Mr. Chapman for isolated legal matters. But, induced by Mr. Chapman and Ms. Hartnett, Mr. Smith eventually retained Mr. Chapman to serve as a "general counsel" for virtually all of his many corporate entities, and for many personal legal matters of great importance to Mr. and Mrs. Smith. Ms. Hartnett, all the while, encouraged the relationship between Mr. Chapman and Mr. Smith by working for entities associated with Mr. Smith.

Mr. Smith first met Mr. Chapman in 2010. By 2011 Mr. Chapman was performing substantial legal work for Plaintiffs and other entities associated with Mr. Smith. By 2012, and through March 6, 2014, Mr. Chapman was handling virtually all legal matters for Mr. Smith and his related entities, including the entity Plaintiffs, as well as for Mrs. Smith. Ms. Hartnett furthered the relationship, both socially and through her role at the companies. Mr. Chapman traveled, at least monthly, from his home base in Florida to Charlotte, purportedly to manage legal affairs for Plaintiffs. Ms. Hartnett travelled from her home in Florida to work for the Smith- related entities, which are Charlotte- based.

Unbeknownst to Plaintiffs, for large parts of 2012, and all of 2013 through March 6, 2014, Mr. Chapman was secretly, and without authorization, misappropriating enormous amounts of money from Plaintiffs and other entities associated with Mr. and Mrs. Smith. There

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

was nothing particularly complex or clever about the fraud. Mr. Chapman was simply taking Plaintiffs' funds regularly from his law firm trust account, and using those funds to finance a personal lifestyle that Mr. Chapman and Ms. Hartnett could not otherwise afford. By the height of the fraud in 2013, Mr. Chapman was paying his American Express bills directly from the trust account most months. Some months, Mr. Chapman diverted more than $50,000 to his personal American Express cards. In addition, Mr. Chapman used trust account funds to buy two high end BMWs for himself and Ms. Hartnett to drive in North Carolina and in Florida. He also used funds from Plaintiffs and other Smith entities to finance his hobby of riding polo horses, purchasing everything from a horse trailer to polo club fees with Plaintiffs' money.

The fraud only stopped on March 7, 2014 when, tipped off by one of Mr. Chapman's law firm employees, counsel for Plaintiffs travelled to Mr. Chapman's law offices in Florida and confronted him.

## PARTIES

1.  Mr. Smith is a natural person and Florida resident who at all times relevant to this Complaint lived in Charlotte, North Carolina and Wellington, Florida.

2.  Mrs. Smith is a natural person and North Carolina resident who at all times relevant to this Complaint lived in Charlotte, North Carolina and Wellington, Florida.

3.  DRS Family Management is a limited liability company organized under the laws of Florida, with its principal place of business in Wellington, Florida.

4.  Fortis is a limited liability company organized under the laws of Florida, with its principal place of business in Wellington, Florida.

3

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

5. Smith Clovis is a limited liability company organized under the laws of Florida, with its principal place of business in Wellington, Florida.

6. Clovis is a limited liability company organized under the laws of Florida with its principal place of business in Wellington, Florida.

7. Smith and Sons is a limited liability company organized under the laws of Florida with its principal place of business in Wellington, Florida.

8. Mr. Chapman is a natural person who, on information and belief, is a citizen and resident of Wellington, Florida.

9. Ms. Hartnett is a natural person who, on information and belief, is a citizen and resident of Wellington, Florida.

10. Chapman Law is a professional limited liability company organized under the laws of Florida, with its principal place of business in Wellington, Florida.

## JURISDICTION AND VENUE

11. This Court has original jurisdiction, under 28 U.S.C. § 1331 (federal question), because Plaintiffs assert civil claims arising under the laws of the United States, in particular 18 U.S.C. § 1962.

12. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over those of Plaintiffs' claims that arise under North Carolina law.

13. Venue is proper in the Western District of North Carolina, Charlotte Division, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

4

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

## FACTS

### The Relationship Between Plaintiffs and Defendants

14.     Chapman is an attorney who, at all times relevant to this action, was licensed and based in Florida.

15.     Chapman managed and operated from a law firm, Chapman Law, at all times relevant to this action.

16.     Chapman and Hartnett are married, and were married at many times relevant to this action.

17.     Mr. and Mrs. Smith (collectively, "the Smiths") are married, and were married at many times relevant to this action

18.     Mr. Smith is a businessman and entrepreneur, who founded, controlled, advised, benefitted from, or was otherwise related to DRS Family Management, Fortis, Smith Clovis, Clovis, and Smith and Sons (collectively, the "Entities").

19.     The Smiths met Mr. Chapman during 2010. Mrs. Smith and Ms. Hartnett had a prior social relationship, and Mr. Chapman used that social relationship as an introduction to a professional relationship with Mr. Smith and, ultimately, all Plaintiffs.

20.     During 2010, and increasingly after the beginning of 2011, after the initial introduction between Messrs. Chapman and Smith, Plaintiffs retained Mr. Chapman and Chapman Law to perform legal work for them. Mr. Chapman, aided by Ms. Hartnett, systematically insinuated himself into most aspects of the Smiths' business dealings, and significant aspects of their personal lives. Mr. Chapman's role as counsel for Plaintiffs expanded over time, and eventually included litigation, corporate, tax, and regulatory work.

5

21.     Over the course of 2011 and afterward, Plaintiffs, including the Smiths in particular, came to place significant trust and confidence in Mr. Chapman.  Plaintiffs – two busy individuals and growing corporate entities – generated a significant amount of legal work. Plaintiffs retained Mr. Chapman for increasing amounts of this work, until Mr. Chapman was performing substantially all of the legal work for Plaintiffs as it arose.

22.     By around the middle of 2011 at the latest, Plaintiffs, and Mr. Smith in particular, began to sufficiently trust Mr. Chapman that they would regularly cause to be deposited – principally in Mr. Chapman's law trust account at Chapman Law ("Trust Account"), but also in other accounts controlled by Mr. Chapman – significant funds belonging to Plaintiffs.  Mr. Chapman induced and encouraged Plaintiffs to entrust their funds into his custody and control.

23.     Indeed, by 2012 at the latest, Mr. Chapman convinced Plaintiffs that he could be relied on, in addition to his legal responsibilities, to manage significant financial transactions and payments for Plaintiffs.  For example, Mr. Chapman was entrusted with conducting due diligence and orchestrating Clovis' investment in a Texas mineral rights investment that has since been revealed to be a fraudulent "Ponzi Scheme."  In addition, Mr. Chapman and Chapman Law generally handled routine financial administration for Plaintiffs and, in particular, for the Smiths.

24.     Mr. Chapman encouraged the Smiths and other Plaintiffs to completely trust and rely upon Mr. Chapman's management of the substantial funds placed in his control.

25.     By late 2011 or early 2012, Mr. Smith increasingly entrusted Mr. Chapman with his most important business and personal matters, including having Mr. Chapman represent him on boards of companies Mr. Smith was involved with, and asking Mr. Chapman to manage important logistical details connected with Mr. Smith's divorce from a previous wife.

6

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

26.     During the first half of 2012, Mr. Chapman approached Mr. Smith and required him, on behalf of the Plaintiffs, to accept a legal fee arrangement where Plaintiffs would remit to Mr. Chapman and Chapman Law a monthly "flat fee" – usually around $50,000 per month – to cover all fees and costs for legal and advisory services provided by Mr. Chapman to Plaintiffs and other entities associated with Mr. Smith (the "Flat Fee Arrangement").

27.     By now dependent on Mr. Chapman, who Mr. Smith at this stage knew of no reason not to completely trust, Mr. Smith and Plaintiffs accepted the Flat Fee Arrangement.

28.     As agreed under the Flat Fee Arrangement, Mr. Chapman and Chapman Law were authorized to withdraw $50,000 (and generally no more) from the Trust Account each month as compensation under the Flat Fee Arrangement.  The Flat Fee Arrangement was in place between, at latest, May 2012 through the first week of March 2014.  During this time, the Parties understood that Mr. Chapman would receive no additional funds for fees, and Mr. Chapman was not authorized to appropriate for personal use any funds exceeding those allowed by the Flat Fee Arrangement.

29.     Between 2012 through approximately the first week of March 2014, the Plaintiffs and, in particular, the Smiths, continued to completely entrust Mr. Chapman with their personal legal and financial matters.  They relied on Mr. Chapman, as their attorney, to accurately account for and protect funds belonging to them in his custody.  In reliance on Mr. Chapman's assurances and representations, they did not independently verify balances of their funds in the Trust Account.

30.     Around September 2012, Mr. Chapman approached Mr. Smith and demanded that Mr. Smith extend to him a $600,000 loan to be used by Mr. Chapman to purchase a residence for Mr. Chapman and his wife, Ms. Hartnett.

7

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

31.     Feeling pressured by this demand from a lawyer whom he had come to trust and had become reliant upon, Mr. Smith agreed to make the loan.

32.     The nature of the loan (from a client to his lawyer) implicated conflict of interest ethics rules requiring Mr. Chapman to make certain written disclosures to Mr. Smith, obtain written informed consent, and comply with other ethical requirements.  In addition, given that the loan was for a significant amount of money, Mr. Chapman (as Mr. Smith's lawyer) should have documented it.  Notwithstanding the requirements of legal ethics and competent legal practice, Mr. Chapman did not prepare or execute any documentation whatsoever advising Mr. Smith of the conflict or properly memorializing the loan.

33.     Indeed, Plaintiffs recently have discovered that Mr. Chapman's legal work was deficient in myriad respects, and that he often failed to properly prepare important documentation – sometimes failing to prepare necessary documents at all, and sometimes preparing documents but drafting them negligently.

34.     The Smiths, high net worth individuals, principally divide their time between Charlotte, North Carolina and Wellington, Florida.  Mr. Smith is involved with businesses, including the Entities, in both North Carolina and Florida (among other States).

35.     As such, Mr. Chapman regularly travelled to Charlotte, at least monthly, to conduct legal work for Mr. Smith, certain Entities, and other companies associated with Mr. Smith in the Charlotte area.

36.     In addition, Mr. Chapman directed mail and wire communications from his Florida offices to Charlotte on a near- daily basis, during 2012 through early March 2014, in connection with his work for Plaintiffs.  Upon information and belief, Mr. Chapman had few to no other clients.

8

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

37.     By some point in 2012 through March 2014, upon information and belief, substantially all of the funds in the Trust Account belonged to Plaintiffs or other entities associated with the Smiths.

38.     Mr. Chapman had exclusive direct control over transfer of funds out of the Trust Account.

39.     Mr. Chapman developed and used his position of trust as Plaintiffs' lawyer to put himself in a position where he could exercise control over Plaintiffs' funds, and ultimately misappropriate them without their knowledge.

40.     Ms. Hartnett, as well, insinuated herself into Plaintiffs' trust and operations, ultimately assuming a management position at two companies associated with Mr. Smith.  In material part, Ms. Hartnett developed this relationship with Mr. Smith in order to help her husband, Mr. Chapman, gain more trust and exercise more control over Plaintiffs.  As such, Mr. Chapman and Ms. Hartnett colluded as an organized team to infiltrate the Smiths' personal and business operations, for the purpose of secretly stealing enormous amounts of Plaintiffs' money and otherwise abusing Plaintiffs' trust.

### Chapman's Fraud is Revealed

41.     For most of the time that Mr. Chapman worked as Plaintiffs' lawyer, he was flagrantly abusing their trust by using their funds, in his Trust Account, as a personal piggy bank to finance a high flying lifestyle for himself and Ms. Hartnett.

42.     From December 2012 through March 7, 2014, Mr. Chapman and Chapman Law employed Lisa Boettner.

9

43.     Ms. Boettner's work included assisting Mr. Chapman with the administrative details of work that Mr. Chapman performed for Plaintiffs.  In particular, her work included maintaining files and reviewing money transfers.

44.     During late February or early March 2014, Ms. Boettner approached Mr. Smith and informed him that she had learned that Mr. Chapman was using Plaintiffs' Trust Account Funds, far in excess of those authorized by the Flat Fee Arrangement, for the benefit of Mr. Chapman and his wife, Ms. Hartnett.

45.     Plaintiffs are still discovering the extent of Defendants' misappropriation, but it appears that Defendants misappropriated over $2 million in Plaintiffs' funds from the Trust Account to support a lifestyle to which Defendants aspired but could not afford without the fraud.  The misappropriated amount far exceeds, and is separate from and in addition to, any amount that Mr. Smith and Plaintiffs authorized Mr. Chapman to pay himself monthly for legal fees or costs, or any other authorized transfers.

46.     In particular, Mr. Chapman made transfers, of approximately $60,000 and $80,000, of Plaintiffs' funds directly out of the Trust Account to purchase two BMWs during 2013 (the "BMWs").  Mr. Chapman maintained one BMW in Florida for use while at home, and one BMW in Charlotte, for use by himself and Ms. Hartnett (who, like Mr. Chapman, regularly worked in Charlotte) while working in Charlotte.

47.     No Plaintiff or owner of funds in the Trust Account authorized Mr. Chapman to use their funds in the Trust Account to purchase the BMWs.  Indeed, until Ms. Boettner revealed Mr. Chapman's fraud to Mr. Smith, Plaintiffs were completely unaware of the BMWs.

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

48.    In addition, Mr. Chapman made monthly transfers of Plaintiffs' funds directly out of the Trust Account, many months of 2013 through February 2014, to pay the balance of his personal American Express cards ("AmEx Transfers").

49.    No Plaintiff or owner of funds in the Trust Account authorized Mr. Chapman to make the AmEx Transfers.  Indeed, until Ms. Boettner revealed Mr. Chapman's fraud to Mr. Smith, and Mr. Smith investigated, Plaintiffs were completely unaware of the AmEx Transfers.

50.    The AmEx Transfers covered personal expenses of not only Mr. Chapman but, upon information and belief, Ms. Hartnett as well.

51.    Many months, the AmEx Transfers exceeded $50,000 *for one month alone*.

52.    Mr. Chapman executed the AmEx Transfers electronically, via internet payment, by causing Plaintiffs' funds to be transferred from his Trust Account to an account controlled by American Express.

53.    For example, among other months, Mr. Chapman made the following AmEx Transfers:

a.    Three on or around May 29, 2013 totaling at least approximately $39,326.66.

b.    Two on or around July 1, 2013 totaling at least approximately $20,655.60.

c.    Three on or around August 15, 2013 totaling at least approximately $79,032.75.

d.    Two on September 30, 2013 totaling at least approximately $43,552.31.

e.    Two on November 15, 2013 totaling at least approximately $65,676.12.

f.    Two on December 30, 2013 totaling at least approximately $58,114.42.

g.    Two on February 14, 2014 totaling at least $48,714.06, only three weeks before Plaintiffs detected and intervened to halt Mr. Chapman's fraud.

11

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

54. Plaintiffs are still attempting to determine the total amount of their money that Mr. Chapman diverted through the AmEx Transfer scheme, but currently estimate that their loss attributable to this isolated part of Mr. Chapman's fraud alone exceeds $361,000.

55. Not content to secretly use Plaintiffs' funds to pay for two high- end BMWs and his monthly American Express bills, Mr. Chapman – an avid horse polo playing enthusiast – used funds belonging to Plaintiffs in his Trust Account, without their knowledge or consent, to pay for, *inter alia*:

   a. A trailer, costing more than $40,000, so that he and Ms. Hartnett could haul his polo horses between polo clubs.

   b. Membership fees or other expenses for himself and Ms. Hartnett at the International Polo Club, an expensive and prestigious horse club for the nation's equestrian elite in Wellington, Florida.

   c. On or around February 21, 2014, shortly before Plaintiffs detected and intervened with Mr. Chapman to halt the fraud, personal investments of at least approximately $35,000, through an investment adviser friend from Mr. Chapman's college days, that exclusively benefitted Mr. Chapman and Ms. Hartnett. Upon information and belief, Mr. Chapman paid this $35,000 via wire transfer from a Bank of America in Wellington, Florida to an account outside of Florida, potentially in New York (where the offices of his investment adviser college friend were located).

   d. Numerous of Mr. Chapman and Ms. Hartnett's entertainment expenses, including, upon information and belief, their visits to strip clubs.

12

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

e.   Mr. Chapman and Ms. Hartnett's 2013 vacation to Italy, which was financed with over $60,000 of Plaintiffs' funds, as well as their trip to Hawaii, also last year.

f.   Advertisements for Chapman Law's "equestrian law practice" in magazines associated with the polo club.

56.   Mr. Chapman's rampant misappropriation of Plaintiffs' funds in his trust account, and the enjoyment of Mr. Chapman and Ms. Hartnett of those funds, continued until 10 a.m. on March 7, 2014. That morning, Plaintiffs' representatives, acting on information provided by Ms. Boettner, personally confronted Mr. Chapman, at his offices in Wellington, Florida, and caused him to cease making the improper transfers.

57.   Had Plaintiffs not intervened on March 7, 2014, Defendants' misconduct would have persisted indefinitely.

58.   Ms. Hartnett knew that Mr. Chapman was misappropriating funds to support the couple's lifestyle, which could not have been sustained by their legitimate income alone. Indeed, as noted above, she was instrumental in establishing and developing the professional relationship through which Mr. Chapman had perpetrated the fraud.

**Defendants' Continued Efforts to Cover Up the Misconduct**

59.   In the days following March 7, 2014, Plaintiffs and their representatives diligently attempted to gather information regarding the scope of the misconduct, including demanding and reviewing documents from Mr. Chapman and Chapman Law.

60.   Mr. Chapman unduly delayed the production of large portions of Plaintiffs' legal and accounting files to Plaintiffs through various tactics. Among other tactics intended to defer and hinder Plaintiffs' discovery of the full scope of Defendants' wrongdoing, Mr. Chapman produced files only gradually and in incomplete form, first baselessly (and preposterously,

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

considering his unauthorized diversion of over $2 million of Plaintiffs' funds) insisting that Plaintiffs would have to pay purportedly unpaid legal fees (which, of course, had been paid) and later blaming the dilatory production on his lack of staff.

61.     Plaintiffs ultimately learned that Mr. Chapman maintained his files, including receipts and accounting records, in unusually slipshod fashion.  For instance, Mr. Chapman and Chapman Law maintained disorganized receipts in plastic bags around the office and routinely failed to include, within legal files, documents that would typically be maintained in the file. Such recordkeeping practices were part of Mr. Chapman's skullduggery, intended to further mask his misconduct and complicate any forensic review.

62.     To date, Plaintiffs have only recovered a portion of the misappropriated funds, and still have not confirmed the full extent of Defendants' misconduct.

63.     Defendants' misconduct was intentional, willful, reckless, and wanton.

## FIRST CAUSE OF ACTION
### Racketeer Influenced and Corrupt Organizations Act ("RICO")
### 18 U.S.C. § 1962(a)

64.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

65.     Defendants received income from a pattern of racketeering activity.   Mr. Chapman, without authorization and secretly, diverted Plaintiffs' Trust Account funds to himself, his law firm, and Ms. Hartnett.  Among other instances, the pattern is established by each AmEx Transfer, the purchase of the BMWs, and each other transaction referenced above and herein.

66.     Specifically, Mr. Chapman committed multiple acts of wire fraud, in violation of 18 U.S.C. § 1343, which constitutes "racketeering activity."   In particular, each of the AmEx

14

transfers and each transfer for a BMW constituted a separate scheme to defraud Plaintiffs, and constituted wire transfers in furtherance of that scheme.

67.     In addition, Mr. Chapman engaged in monetary transactions in property derived from unlawful activity, in violation of 18 U.S.C. § 1957(a), which constitutes "racketeering activity."   In particular, any AmEx Transfer was derived from Mr. Chapman's fraudulent conversion of Plaintiffs' property, and many of the identified AmEx Transactions exceeded $10,000.  The AmEx Transfers were derived from an account at Bank of America, which is a financial institution.  Mr. Chapman knew that the funds used for the AmEx Transfers did not belong to him, and that he unlawfully obtained them.

68.     In addition, Mr. Chapman and Ms. Hartnett engaged in interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a)(3), which constitutes "racketeering activity."  In particular, Mr. Chapman and Ms. Hartnett travelled between Florida and North Carolina, with the intent to promote unlawful activity (namely, the fraudulent conversion of Plaintiffs' funds), and performed unlawful activity, namely the violation of 18 U.S.C. § 1957(a).

69.     Defendants invested those proceeds in the operation of two enterprises, namely Chapman Law and the joint activities of Mr. Chapman and Ms. Hartnett, as part of their married life (the "Chapman- Hartnett Union").

70.     Chapman Law engaged in or directed its activities toward interstate commerce. In particular, Chapman Law, a Florida law firm, represented Plaintiffs and other parties in North Carolina matters.

71.     The Chapman- Hartnett Union and Ms. Hartnett engaged in or directed their activities toward interstate commerce.  In particular, Ms. Hartnett, a Florida resident, worked in

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

North Carolina and used proceeds of the racketeering activity, such as one of the BMWs, in Charlotte.

72.    The conduct referenced herein violated 18 U.S.C. § 1962(a).

**SECOND CAUSE OF ACTION**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(b)**

73.    Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

74.    Mr. Chapman violated 18 U.S.C. § 1962(b) by maintaining, through a pattern of racketeering activity, an interest in an enterprise engaged in interstate commerce.

75.    In particular, Mr. Chapman committed the racketeering activity alleged above and herein, in part, to maintain his interest and control in Chapman Law, which was an enterprise that engaged in interstate commerce.  Chapman Law, a Florida law firm, assisted North Carolina entities and individuals, including, without limitation, Mrs. Smith.

76.    This conduct violated 18 U.S.C. § 1962(b).

**THIRD CAUSE OF ACTION**
**Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(c)**

77.    Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

78.    Defendants Mr. Chapman and Ms. Hartnett violated 18 U.S.C. 1962(c) via, separately, Chapman Law and the Chapman- Hartnett Union.

79.    With respect to Chapman Law, as already alleged, Chapman law was a Florida-based law firm that directed professional activities to North Carolina clients, constituting interstate commerce.

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

80. Mr. Chapman was employed by Chapman Law. Ms. Hartnett was associated with Chapman Law, in that she received proceeds generated by Chapman Law, including the funds that Chapman Law fraudulently obtained from Plaintiffs.

81. Mr. Chapman participated directly in the conduct of the Chapman Law enterprise, by acting as its principal attorney.

82. Ms. Hartnett participated indirectly in the conduct of the Chapman Law enterprise, by receiving funds from it, and by establishing and developing the attorney- client relationship between Chapman Law and Plaintiffs.

83. Defendants participated in the Chapman Law enterprise through a pattern of racketeering activity that included at least two racketeering acts, which are alleged with particularity above.

84. With respect to the Chapman- Hartnett Union enterprise, Mr. Chapman and Ms. Hartnett were a married couple that resided in Florida and participated in interstate commerce by working for North Carolina entities, including (in Mr. Chapman's case) by performing legal work for Mr. Smith's North Carolina businesses, and for Mr. Smith and Mrs. Smith, individually, in North Carolina. In Ms. Hartnett's case, she worked for North Carolina entities associated with certain Plaintiffs, in part, to further the fraud.

85. Mr. Chapman and Ms. Hartnett, of course, were both associated with their marriage, the Chapman- Hartnett Union, and participated directly in its affairs.

86. Mr. Chapman and Ms. Hartnett used the Chapman- Hartnett Union to participate in a pattern of racketeering activity, including two racketeering acts, which are alleged above with particularity.

87. This conduct violated 18 U.S.C. § 1962(c).

17

## FOURTH CAUSE OF ACTION
### Conspiracy to Violate RICO
### 18 U.S.C. § 1962(d) by Conspiracy to Violate § 1962(a) through (c).

88.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

89.     Defendants agreed to commit a substantive RICO offense, namely those offenses alleged in detail in the First through Third Causes of Action, above, which violated 18 U.S.C. §§ 1962(a) through (c).

90.     Each defendant knew and agreed to the overall objective of the RICO offenses, namely fraudulently obtaining and appropriating substantial amounts of Plaintiffs' funds.

91.     This conduct establishes a conspiracy in violation of 18 U.S.C. 1962(d).

## FIFTH CAUSE OF ACTION
### Fraud

92.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

93.     Mr. Chapman committed fraud against Plaintiffs by making a false representation or concealment of a material fact, that is reasonably calculated to deceive, with intent to deceive Plaintiffs, which did in fact deceive them, resulting in injury to them.

94.     In particular, Mr. Chapman advised Plaintiffs that he would safeguard funds in the Trust Account, and other of Plaintiffs' funds that were entrusted to him, when, in fact, he was misappropriating the funds as alleged above in detail. Among other examples, Mr. Chapman concealed the AmEx Transfers, the BMW purchases, and the other transfers recited above.  His assertions that he was safeguarding funds constitute a false representation of a material fact, and his concealment of his misappropriation of the funds constitutes concealment of a material fact.

18

95.     Mr. Chapman's misrepresentations were reasonably calculated to deceive Plaintiffs, because he knew that Plaintiffs were relying on him to safeguard the funds when, in fact, he was stealing them.  Mr. Chapman knew that, if Plaintiffs discovered the ongoing misappropriation, they would (as they did on March 7, 2014) intervene to cease the transfers and to make corrective action.  Accordingly, Mr. Chapman covered up the transfers to perpetuate his misappropriation.

96.     Plaintiffs were deceived by Mr. Chapman's misrepresentations, and allowed substantial funds to remain in Mr. Chapman's trust and care for over two years, in reliance on his misrepresentation that he was safeguarding them.

97.     Mr. Chapman's conduct injured Plaintiffs by causing them to lose, as a result of the conduct, millions of dollars.

98.     The conduct described above constitutes fraud by Mr. Chapman.

## SIXTH CAUSE OF ACTION
### Civil Conspiracy to Commit Fraud

99.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

100.    Mr. Chapman and Ms. Hartnett agreed to misappropriate Plaintiffs' funds, as alleged herein.

101.    This resulted in injury to Plaintiff inflicted by Mr. Chapman and Ms. Hartnett, as alleged herein, pursuant to a common scheme.

102.    In particular, Mr. Chapman and Ms. Hartnett took advantage of the trust that the Smiths and other Plaintiffs reposed in Mr. Chapman, as their lawyer, by using that relationship to commit fraud and misappropriate substantial funds from Plaintiffs.

103.    This conduct constitutes a civil conspiracy.

19

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

**SEVENTH CAUSE OF ACTION**
**Conversion**

104. Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

105. Plaintiffs owned the funds they entrusted with Mr. Chapman and Chapman Law.

106. Defendants wrongfully deprived those funds from Plaintiffs by, among other means, misappropriating the funds for their own personal use, including the BMWs, the AmEx Transfers, the vacations, the horse trailer, the club dues, and other uses alleged herein.

107. This conduct constitutes conversion by all Defendants.

**EIGHTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**

108. Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

109. A fiduciary relationship existed between Plaintiffs and Mr. Chapman, in which Mr. Chapman was a fiduciary for Plaintiffs. In particular, as Plaintiffs' attorney, Mr. Chapman was bound to use funds entrusted by Plaintiffs into his custody, including the Trust Account funds, in the manner in which Plaintiffs' directed, and in their best interests. Plaintiffs directed Mr. Chapman to hold their funds in his custody for their benefit, and to use those funds only in a manner benefitting their exclusive interests.

110. However, Mr. Chapman, as fiduciary, failed to act in good faith and with due regard to Plaintiff's interests. In particular, he misappropriated Plaintiffs' funds in his care for his own benefit, including for the AmEx Transfers, the BMWs, and the other personal purchases alleged above and herein.

111. This conduct constitutes breach of Mr. Chapman's fiduciary duty.

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

## NINTH CAUSE OF ACTION
### Constructive Fraud

112.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

113.     A relationship of trust and confidence existed between Mr. Chapman and each Plaintiff, because he was their attorney.

114.     Mr. Chapman took advantage of that position of trust in order to benefit himself. Namely, he used that position to secretly misappropriate substantial amounts of Plaintiffs' funds for his own personal benefit, as alleged elsewhere herein.

115.     Plaintiffs were, as a result, injured, as alleged elsewhere herein.

116.     This conduct constitutes a constructive fraud by Mr. Chapman upon Plaintiffs.

## TENTH CAUSE OF ACTION
### Action for Accounting

117.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

118.     Mr. Chapman and Chapman Law have a duty to render account to Plaintiffs.  Mr. Chapman and Chapman Law were Plaintiffs' lawyer and law firm at all times material to this action, and are required as such to expressly account to Plaintiffs, their clients, for funds entrusted into their custody.  Moreover, as a fiduciary for Plaintiffs, Mr. Chapman is obligated to account for Plaintiffs' funds entrusted into his custody.

119.     Plaintiffs have already demanded a complete accounting of all of their funds in Mr. Chapman and Chapman Law's custody between 2011 and present.  However, this accounting has not yet been satisfactorily provided.

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

120.     Accordingly, Plaintiffs are entitled to, and demand, that Mr. Chapman and Chapman Law provide them with a detailed accounting, covering the complete period from 2011 through present on a daily basis, demonstrating, without limitation: (a) any and all transfers of funds belonging to any Plaintiff or other entity associated with Mr. or Mrs. Smith into any account to which Mr. Chapman had access or control; (b) any and all transfers of funds belonging to any Plaintiff or other entity associated with Mr. or Mrs. Smith out of any account to which Mr. Chapman had access or control; (c) the contents of any American Express accounts to which Mr. Chapman applied the AmEx Transfers, detailed monthly account statements; and, (d) supporting invoices or receipts for any goods or services Defendants purchased with Plaintiffs' money.

### ELEVENTH CAUSE OF ACTION
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq.***

121.     Plaintiffs incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

122.     Mr. Chapman and Chapman Law violated North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. 75-1.1, *et seq.* ("UDTPA") by engaging in an unfair or deceptive act or practice, in or affecting commerce, which proximately caused actual injury to the Plaintiff or their business.

123.     In particular, Mr. Chapman and Chapman Law orchestrated a long- term program of secretly, and without authorization, misappropriating Plaintiffs' funds by inducing Plaintiffs to cause their funds to be entrusted to Defendants' care under the auspices of a legal practice, and then stealing those funds by using them for the personal benefit of Mr. Chapman, Chapman Law, and Mr. Chapman's wife, Ms. Hartnett.

22

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

124.    Mr. Chapman and Chapman Law engaged in the practice of law, which was in or affecting commerce.

125.    The deceptive practices injured Plaintiffs and (in Mr. and Mrs. Smith's case) their businesses, by causing them to sustain hundreds of thousands, if not millions, of dollars in direct financial losses, and then by causing them to have to pay substantial amounts in investigation and legal fees to attempt to determine the full scope of Defendants' misappropriation and recover the funds.

126.    This conduct constitutes a violation of North Carolina's UDTPA.

**TWELFTH CAUSE OF ACTION**
**Unjust Enrichment**

127.    Plaintiffs expressly incorporate and reallege the foregoing Paragraphs as if expressly set forth herein.

128.    All Defendants were unjustly enriched by the misappropriation alleged herein. First, Plaintiffs conferred a benefit upon the other party, including depositing funds into the Trust Account and paying legal fees to Mr. Chapman and Chapman law as unwitting compensation, in part, for the very conduct that Mr. Chapman used to cover up his fraud.

129.    The benefit was not conferred officiously.

130.    The benefit was not gratuitous, Plaintiffs did not intend to gift the funds entrusted into Mr. Chapman's care to any Defendant.

131.    The benefit is measurable.  Provided with sufficient documents from Defendants and the banks to conduct an accounting, Plaintiffs will be able to determine and demonstrate the full scope of the loss.

132.    All Defendants consciously accepted the benefit.  Indeed, Mr. Chapman and Chapman law deliberately undertook to take Plaintiffs' funds for their own purposes and, at

NPCHLT1:681081.1-PG-(WTERPENING) 049039-00000

minimum, Ms. Hartnett knew that she was receiving and personally benefitting from the funds and what those funds were used to purchase, including BMWs, vacations, polo horse trailers, club memberships, and other entertainment expenses.

133.    All Defendants were unjustly enriched by the foregoing conduct.


## JURY DEMAND

Plaintiffs demand a jury trial on any issues herein triable of right by a jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs demand that the Court:

1.    Award compensatory, punitive, and other damages.

2.    Award treble damages and attorneys' fees.

3.    Award Plaintiffs the costs of this action.

4.    Order an accounting.

5.    Conduct a jury trial on all issues raised in this Complaint.

6.    Award such other and further relief as the Court deems just.

Respectfully submitted, this 8th day of May, 2014.


/s/ William R. Terpening

William R. Terpening
N.C. Bar No. 36418
Jonathan Schulz
N.C. Bar No. Pending

NEXSEN PRUET, PLLC
227 West Trade Street, Suite 1550
Charlotte, NC 28203
Telephone:  (704) 338-5358
Facsimile: (704) 805-4735

*Attorneys for Plaintiffs*

24